CA BAR#284924
VOX POPULI A KENTUCKY NPLLC, LC (**VOX POPULI**)
PRO BONO LEGAL ADVICE AND REPRESENTATION
ADVANCING #MAGA THROUGH THE COURTS
CA BAR #284924
LAWWARRIOR.AI@PROTONMAIL.COM
**POWERED BY LAWWARRIOR.AI**

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA
## EUREKA DIVISION

COMPLAINT FOR: DAMAGES, TEMPORARY RESTRAINING ORDER, AND PERMANENT INJUNCTION

$1,000,000,000 in monetary and punitive damages demanded

JURY TRIAL DEMANDED

| PLAINTIFF(S) | DEFENDANT(S) |
|---|---|
| Dallas **BROGDEN**, a resident of North Carolina, represented by **VOX POPULI** | **HCL** America, Inc., a California Corporation #C1505609, whose address is 330 Potrero Ave., Sunnyvale, CA 94085, represented by **OGLETREE** |
| | United States Citizenship and Immigration Services (**USCIS**), a component of the United States Department of Homeland Security **(DHS)** whose website prominently displays the phrase "Buy American, Hire American" |
| | **OGLETREE**, Deakins, Nash, Smoak & Stewart, P.C., a law firm representing **HCL** |
| | Ms Jennifer **Cotner**, of counsel to **OGLETREE** and **HCL's** attorney |

### INTRODUCTION

Paragraphs are numbered 1.1, 1.2, 1.3, etc. for easier presentation

PARAGRAPH 1 of COMPLAINT

**(1.1)**  There are fourteen companies that, it is widely known and understood (thirteen of which were even identified by the Failing **New York Times**, including **HCL**, in 2015), which rampantly abuse the **H1b** program:
- Tata Consultancy Services (TCS)
- Infosys
- Tech Mahindra
- Wipro
- Larsen & Toubro Infotech
- Mindtree

*Brogden v. HCL, et. al.*

- HCL America
- Accenture
- ZL Technologies
- Capgemini Financial Services
- Cognizant Tech Solutions
- Syntel Consulting
- iGate Tech
- Computer Sciences (not a typo)
- IBM
- Amazon
- Google
- Microsoft
- Intel
- Apple
- Deloitte & Touche

**(1.2)** One can notice how many of these companies claim heartily to value diversity in their public messaging. What they actually value, as will be proven at trial in the case of **HCL,** is cheap labor from India, and since Indians come from a different place, PRESTO DIVERSITY, says Silicon Valley.

**(1.3)** Even progressive San Jose, CA congressman Zoe Lofgren is looking to fight the scam. (H1b does sound like a disease, as the embedded video says. It in fact is, as will be demonstrated herein). This is an issue that both sides of the aisle understand to be abusive.

**(1.4)** What they don't understand, because they haven't lived it, the way **BROGDEN** has, and the way **I,** Plaintiff's Counsel, have, is how badly American citizens are harmed by the program. The desperation of the **H1b** worker drives down wages and working conditions for EVERYONE, even in other companies, since after all the United States operates in a free market.

**(1.5)** Dallas Brogden's tale Is one of legion that I plan to tell around the country, free of charge, until this nightmare has come to an end.

**(1.6)** **HCL** have made themselves into a (according to their public Twitter account) $7 billion company off of American blood. $1 billion is a paltry sum to truly punish them for what they've done to this country. To wit: Two weeks before I met **BROGDEN**, I coincidentally interviewed with **HCL**. Their (Caucasian, unusually) counsel for the entire western hemisphere sits in a windowless office in a dilapidated building in Sunnyvale that **HCL** uses as its headquarters.

**(1.7)** **HE COMPLAINED TO ME ABOUT HIS SALARY WHILE INTERVIEWING ME**.

**(1.8)** **HCL'S ENTIRE COUNSEL FOR THE ENTIRE WESTERN [REDACTED] HEMISPHERE**

**(1.9)** The **H1b Hovels** do not operate without help, which is why **BROGDEN** may amend to allege a **RICO CLAIM**.

**(1.10)** Also complicit are these white-collar sweatshops' law firms, like Kerr and Wagstaffe, which literally helped an **H1b Hovel's CEO** sue his white employees because they DARED to anonymously criticize his hovel on Glassdoor, and like **OGLETREE.**

**(1.11)** So dishonest and corrupt are their practices in defending these unsavory companies that Ms. Cotner, HCL's counsel, requested a 30 day extension to respond to the complaint when this

suit was filed the first time **without giving any reason.** With lawyers no longer exercising <u>even basic judgment</u>, legal briefs may as well be generated by artificial intelligence

**(1.12)** So careless was **COTNER'S** request that it implied that a U.S. Marshal had perjured himself in declaring that **HCL** were served (or, alternatively, **OGLETREE** is part of a broader scheme to flood the courts with unsavory defenses of abusive workplace practices using boilerplate). There is no third explanation for why someone would ask for more time to do a thing and not explain why.

**(1.13)** Justice delayed is justice denied.

**(1.14)** I personally **begged** the court, literally, to not grant this extension, to not make my client wait for justice for no reason whatsoever. Judge Davila granted it almost immediately anyway.

**(1.15)** This case shall not be tried in Silicon Valley, because there is too much confusion between **the harmful impact of the H1b program**, on the one hand, and **RACISM**, on the other hand.

**(1.16)** The **H1b workers** are, in many ways, also victims. Almost all of them are from India. They are trafficked to this country, put up in cheap motels away from their families, and forced to work hours so long that their wages of around $60,000 in the Bay Area (which, it will be proven at trial, drives down wages of non-H1b workers at their companies as well as workers at other **non-H1b-dependent** companies) amount to less than $10/hr.

This is a program that benefits: (1) shareholders of tech companies

It is one that harms: (1) literally everyone else.

PARAGRAPH 2 of Complaint

### THE COURT'S JURISDICTION

**A. Subject Matter Jurisdiction**

**(2.1) BROGDEN** possesses a right to sue letter from the Equal Employment Opportunity Commission (**EEOC**), and since one of her claims is employment discrimination thereunder, **THIS COURT** has Federal Question Jurisdiction under the United States Constitution, and, thereby, has supplemental jurisdiction over the other claims hereunder, which arise out of the same case and controversy as those terms are defined by case law.

**(2.1.1) Federal Question Jurisdiction under** 28 U.S.C. 1331 and 42 U.S.C. 1201, Title VII of the Civil Rights Act of 1964 ("the Act"), *inter alia*
**(2.1.2) Supplemental Jurisdiction under** 28 U.S.C. 1367

[CONTINUED ON NEXT PAGE]

*Brogden v. HCL, et. al.*

B. **PERSONAL JURISDICTION**
   **(2.2)**

| DEFENDANT | BASIS FOR PERSONAL JURISDICTION |
|---|---|
| **HCL** America, Inc., a California Corporation #C1505609, whose address is <u>330 Potrero Ave., Sunnyvale, CA 94085</u>, represented by **OGLETREE** | Headquartered in the Northern District of California |
| United States Citizenship and Immigration Services (**USCIS**), a component of the United States Department of Homeland Security **(DHS)** whose website prominently displays the phrase "Buy American, Hire American" | Government Agency |
| **OGLETREE**, Deakins, Nash, Smoak & Stewart, P.C., a law firm representing **HCL** | Defendant's counsel, thereby submitting to personal jurisdiction |
| Ms Jennifer **Cotner**, of counsel to **OGLETREE** and **HCL's** attorney | Defendant's counsel, and licensed to practice under CA law, thereby submitting to personal jurisdiction |

<u>Paragraph 3 of Complaint</u>

## STATEMENT OF FACTS

**(3.1) BROGDEN** began her nightmare employment with **HCL** with the title "associate executive" in or around 2013.

**(3.2) BROGDEN'S DUTIES** were more akin to, in **MY** words, a "glorified receptionist"

   **(3.2.1)** On **MY** information and belief, **HCL** assigned **BROGDEN** this title to circumvent wage and hour laws that require payment of overtime to **EXEMPT** employees (such as receptionists)

**(3.3)** DESPITE being given a litany of unrelated tasks, from purchasing for an entire department to taking badge photos, processing HR paperwork, answering calls, and more, **BROGDEN** excelled, receiving praise from nearly every project manager she worked for (both for her performance and her cheerful attitude) despite the constant chaos.

**(3.4)** When **BROGDEN'S** initial supervisor departed in October 2013, the person who was just under him was Tony Cotto. (**COTTO**) **COTTO** was so overwhelmed by all of his duties coupled with his predecessors', a typical cost-cutting measure for **H1b hovels,** that he wholly ignored **BROGDEN** as his assistant. Cotto ignored Plaintiff's protestations regarding the security site supervisor, Donnell Burke's (**BURKE**) conduct.

**(3.5)** Now, with **BURKE** being assigned as **BROGDEN'S** supervisor, **BROGDEN'S** responsibilities were essentially eliminated. Every duty she had theretofore efficiently and amiably performed had been taken away from her, and the comments **BURKE** had made created a hostile work environment. **BROGDEN'S** complaints to **COTTO** and to **HCL'S** HR department fell on deaf ears, unsurprising in light of **H1b HOVELS'** well-known and reviled employment practices.

**(3.6) BROGDEN,** a Caucasian woman of middle age, was simply blown off as being hysterical or emotional.

**(3.7)** This treatment prompted **BROGDEN** to leave the admin department; she migrated to a specific project, **FEDEX**.

**(3.8)** Upon joining the **FEDEX** project, **BROGDEN** was put on a small team run by Brenda Purnell (**PURNELL**), who had previously clashed with **BROGDEN** when **BROGDEN** had been in admin, behaving condescendingly and cattily, bristling at the fact that **BROGDEN** didn't demonstrate the sort of dutiful obeisance she felt she deserved by virtue of her position

> **(3.8.1)** And, undoubtedly, the obeisance she *did* receive from **H1b workers**, who literally were to leave the country the next day if their employment were tond, by law
>
> **(3.8.2)** In American society, employers are not viewed as owning their employees. In other cultures like China and India, where there are nearly 1 billion people each, quality employment opportunities are relatively scarce (70% of Indians live in rural areas); therefore, these workers are accustomed to essential servitude to their employers, a fact which has no choice but to impact how the supervisors in US H1b Hovels treat other, non H1b employees. Power corrupts, and absolute power corrupts absolutely.

**(3.9) PURNELL** made demeaning remarks about **BROGDEN,** making fun of her for even DARING to ask clarifying questions, and so mistreating **BROGDEN** as to cause her to have panic attacks.

**(3.10)** When **PURNELL** came to tell **BROGDEN** that she was being moved to another team, she told her that **BROGDEN** was chosen because she was "the least valuable member of the team", a statement which, in light of **BROGDEN'S** heretofore sterling performance reviews, belies borderline criminal harassment on the part of **PURNELL.**

**(3.11) HCL** knew since at least 2013 that **BROGDEN** had autism. **BROGDEN** repeatedly asked for minor accommodations to allow her to perform her job, namely being able to TAKE BREAKS when needed during times when **BROGDEN** felt overwhelmed. This request was described as **IMPOSSIBLE**, responding that, at most, they could provide her ten minute breaks, or one extra fifteen minute break during the day, at a set time (thereby defeating the entire purpose of the accommodation request)

> **(3.11.1)** Why not? With the H1b workers literally desperate for their survival in this country, what incentive did HR have to help **BROGDEN?** This is just part of the insidious evil wrought by the **H1b.**

**(3.12)** Had **HCL** agreed to even MODESTLY reasonable accommodations, **BROGDEN** would have been more productive. **HCL's** conduct was plainly motivated by spite.

**(3.13)** After **FEDEX, BROGDEN** was assigned to a new manager, Paul Davis (**DAVIS). BROGDEN** THRIVED under **DAVIS**, receiving as many compliments and kudos from clients as she had during her days in admin. Indeed, people would call **specifically asking for BROGDEN by name because of how good she was at her job**.

> **(3.13.1)** All it took was the following LIMITED accommodation: When **BROGDEN** felt overloaded by her condition, **DAVIS** would let her step away for a bit. Even during Peak season, the holiday

period, **BROGDEN** was able to still perform her duties. While she was slower on her call numbers, she was also recognized as being more helpful, detailed, and thorough with each person. The latter are values that are uniquely American. In a nation of 1 billion as India is, there is not time to value courtesy or thoughtfulness. This is the culture clash that causes the H1b to literally torture American workers—they join thinking this is a normal American work environment, when in fact it couldn't be farther from it.

**(3.14) DAVIS** was transferred to assist with another project in what ended up being a permanent move. His replacement was a manager of another project that **BROGDEN** knew well, Lisbon Chavious. **(CHAVIOUS).** While **CHAVIOUS** was a decent manager, he was nowhere near as accommodating as **DAVIS**. He didn't have any understanding of what **BROGDEN**'s needs were with respect to Autism. Whenever **BROGDEN** tried to explain, **CHAVIOUS** was dismissive, brushing it off as being merely like his daughter's anxiety.

> **(3.14.1) H1b Hovels** have no interest in human resources issues. As such, their employees (H1b and otherwise) are subject solely to the whims of whomever happens to be managing them at the time, rather than beneficiaries of any sort of institutional attempt to humanely manage employees. When so many employees are one termination away from being sent 10,000 miles away, it's unsurprising that poor working conditions would exist in such firms.

**(3.15)** The team lost employees through attrition—they left or were terminated, and not replaced, which is, again, typical of such firms. This put more pressure on the rest of the team, and **BROGDEN** began struggling. The sensory overload got worse, and **HCL even brought in a team to scrutinize breaks**, which meant **BROGDEN** couldn't step away when she needed to any more.

> **(3.15.1)** Imagine, for a moment, working for a firm so petty and inhumane that an entire team is formed to scrutinize breaks, a team which itself costs money. That is the state of H1b Hovels.

**(3.16) BROGDEN** was in serious need of official accommodation after the foregoing.  This was inconvenient to **HCL's** business model of exploiting desperate employees for maximum gain for its corporate parent in India, **HCL INDIA.**

**(3.17) BROGDEN** again tried to traverse the Soviet-style bureaucracy **HCL** had put in place specifically to discourage any sort of cost increase whatsoever, even where it would be justified, even where it would be profitable in the long run.

**(3.18)** In 2016, after 3 years (about how long I was able to survive my own H1b Hovel), **BROGDEN** had a total and complete nervous breakdown.

**(3.19)** Having already exhausted the employment assistance program (**EAP**), **BROGDEN** couldn't get any help. She started seeing an outside psychologist, because she was scared, overwhelmed, and feared losing her job because she knew she couldn't perform up to the newly elevated numbers **HCL** were now expecting her to meet without needed accommodation.

**(3.20) BROGDEN** ended up out of work for 3 weeks on short term disability. When she came back she was told she'd been moved again to a new team starting up, this one being under Tracy Sledge. **(SLEDGE) BROGDEN** had no training for this new team, Freight, and the team had been started while **BROGDEN** was out. **BROGDEN** received no training from **HCL** when she returned from her disability leave other than to sit with another HCL worker who had received the training for a mere four days.

**(3.20.1)** This sudden, abrupt, and commercially unreasonable (not to mention inhumane) change caused **BROGDEN** extreme panic and anxiety. Every person at HCL that **BROGDEN** spoke with told her that nothing could be done, that things were set as they were and she had no other choice than to comply.
**(3.21)** No one at HCL seemed to understand how much of a struggle it was for **BROGDEN** to try to adjust not only to a new team, new manager, and new procedures, but also twice the call volume as before.
**(3.22) BROGDEN'**s call quality was still in the passing range but slipped. Whereas **BROGDEN** was once receiving perfect or nearly perfect scores on her call audits, there was now a decrease in those marks, attributable directly to **HCL**'s actions and omissions
**(3.33)** There are other job functions **BROGDEN** could have performed, such as email queues or call quality, and both the senior manager and group manager had promised, on several occasions, that as soon as an opening came up they would move **BROGDEN** into one of them.
**(3.34)** Each time an opening came up, these individuals would suddenly claim that they weren't going to fill it, or that they couldn't spare **BROGDEN** from her current role, only for her to find out weeks later that they had put someone else in the same role.
**(3.35)** Both men had informed **BROGDEN** she'd have been well-suited for those other roles and that they'd have been happy to move her to one of them. **BROGDEN** repeatedly requested for just that to be done, or to at least be moved at least to a team that didn't get such a high volume of calls as the one she had been assigned to.
> **(3.35.1)** On **MY** information and belief, **HCL** did so because many of their workers speak accented English and **HCL** needed **BROGDEN** on the newly formed **HCL FREIGHT TEAM** because she is a native speaker of English.

**(3.36)** Each request was denied.
**(3.37) BROGDEN** next requested that she be allowed to use one of **HCL's** laptops to perform the work at home, and while at first she was told she would receive one as soon as they were ready, **HCL** reneged when these laptops were actually distributed.
**(3.38) BROGDEN** even provided a letter from her psychologist, who wrote that **BROGDEN** needed a degree of control over her immediate environment, lights, sounds, smells, and recommended, therefore, that Plaintiff be allowed to work from home.
**(3.39) BROGDEN'S** reasonable accommodation request, supported by amedical professional's recommendation, was denied.
**(3.40) SLEDGE** retaliated against **BROGDEN** the moment she tried to go up the chain of command, after which **SLEDGE** became cold and distant, and most importantly, she allowed **BROGDEN** no additional break time at all going forward in out of spite.
**(3.41)** Sledge began harassing Plaintiff physically, standing far too close to Plaintiff, considering even basic norms of professionalism in the workplace, knowing that this would particularly harm **BROGDEN** given her condition. **SLEDGE** would follow **BROGDEN** everywhere, no matter what reason **BROGDEN** had for leaving her cubicle, normally legitimate work-related questions. **SLEDGE** would stalk over to **BROGDEN**, standing within six inches of her, demanding that she repeat to her every word and even what happened; if **BROGDEN** walked away, **SLEDGE** would follow her back to her desk, and wouldn't leave even then, hovering over **BROGDEN**, literally towering over her as **BROGDEN** was sitting down. **SLEDGE** would falsely accuse **BROGDEN** of raising her voice to her when she hadn't, and yelled at **BROGDEN** to come into a private meeting room where she brought in another manager. **BROGDEN** rightfully felt hounded to the point of yet another breakdown, which indeed occurred. **SLEDGE's** entire demeanor changed, even the tone of her voice: in front of another manager she was soft spoken and feigning concern, whereas mere minutes before that she'd been low voiced, snide, and had

falsely accused **BROGDEN** of something she didn't do. **SLEDGE** was gaslighting **BROGDEN,** pushing her until she broke down so that **SLEDGE** could accuse her of being too emotional and irrational. This was done deliberately by **SLEDGE**. **HCL** failed to properly train or supervise its supervisory employees, and indeed plainly had no interest in doing so.

**(3.42)** These incidents were witnessed by both current and former employees, some of whom left the company on good terms and some of whom did not. By July 2016, **BROGDEN** had been under **SLEDGE's** management for two months. **BROGDEN'S** annual review was due at the end of June. At **HCL**, the manager sends the employee a list of goals and the employee has to provide a self-rating. This rating is provided to the employee's manager, who then rates the employee. A meeting is supposed to then occur, at which the manager and employee discuss the ratings, including any discrepancy or disagreement; note areas of improvement; and the like. The *employee* has the final say in that the employee is supposed to be given the opportunity to rate the feedback discussion with their manager, adding any comments they feel pertinent.

**(3.43)** Unsurprisingly, **HCL** did not (and perhaps normally does not) follow its own policy. **BROGDEN** filled out her self-assessment, and sent it onward in accordance with **HCL**'s policy. **BROGDEN** never even heard back from **SLEDGE**, at all, on the assessment. **BROGDEN** was never notified whether **SLEDGE** had filled out her portion, and never held any meeting or discussion.

**(3.44)** After a period of time if nothing is entered into the system, the employee's review will automatically escalate to the next in the line of command. That's what **BROGDEN** *assumed* had happened upon not hearing from **SLEDGE**. Things had become so strained between **BROGDEN** and **SLEDGE** that it was a veritable relief on **BROGDEN's** part to not to have to endure another Machiavellian manipulation session.

**(3.45)** In addition to all of this, **BROGDEN** was missing a lot more work, and this dark spiral cost **BROGDEN** dearly, because now, out of some ill-conceived vendetta, **SLEDGE** wouldn't allow **BROGDEN** to make up that time, as **SLEDGE** previously had prior to the losing money because now she couldn't make up that time.

**(3.46)** The environment at **HCL** was, in short, toxic and hostile, driving **BROGDEN** to the brink of suicide. **BROGDEN** would have nightmares about having to go in and deal with Sledge. To everyone else in management **SLEDGE** was smiling, pleasant, and "only doing her job diligently to make sure no employees abuse breaks. Everyone on her team, however, knew she'd pick and choose who she'd allow to take off or make up time, a sort of ad-hoc favoritism that is quite common in H1b Hovels.

**(3.47) BROGDEN's** numbers were tanked, and her audits were getting worse. She couldn't gain any balance at all because of **HCL**'s adamant refusal to make even the most minimal of accommodations for a diligent, hard-working, well-reviewed, and long-tenured employee.
> **(3.47.1)** They knew they could simply import someone from India to do her job more cheaply as long as they gave the person a high enough title and worked them enough hours to make the servitudinal investment worthwhile on a per hour basis.

**(3.48) BROGDEN** went to HR again and filed a formal complaint of retaliation, correctly believing that that's exactly what **SLEDGE** was engaging in. As mentioned, **SLEDGE only** behaved menacingly toward **BRODGDEN** when **BROGDEN** had escalated her request for a reasonable accommodation.
**(3.49) BROGDEN** was out of work two days after having had her phone interview with Kim Freeman in HR (**FREEMAN**). I seriously can't make this up: **SLEDGE** was heard on the call floor, because it was an open area, telling her 3 team leads that "I'll show her the meaning of retaliation". She said it in a room full of people, and it was heard by at least one other person. It will be proven.
**(3.50) SLEDGE** had **BRODGEN**'s performance review manually unlocked and sent back down to her, upon which she proceeded to give **BROGDEN** the lowest permissible rating.
**(3.51)** Even more alarmingly, there was suddenly a rating entered for a "feedback discussion" that **NEVER TOOK PLACE**. No kind of meeting had occurred about the feedback, whether formal or informal, not passing in the hallway nor in email.
**(3.52) BROGDEN** only came to know of the false review at the end of August, when she received an email **from INDIA** (presumably HCL India) saying her review was finished processing. **BROGDEN** went to look at the email and that's when she saw what **SLEDGE** had done. There's no logical way **BROGDEN** could have performed as poorly as **SLEDGE** claimed, in just two months of working for her, when **BROGDEN** had been RECOMMENDED FOR PROMOTION just six months prior, and certainly not when every other manager had given **BROGDEN** glowing reviews for the prior three years **BROGDEN** was employed by **HCL**.
**(3.53) BROGDEN**, a member of LegalShield, reached out to them to ask what could be done, and they suggested she file a complaint with the Equal Employment Opportunity Commission (**EEOC),** which Plaintiff did do on September 2, 2016.
**(3.54)** On the drive back from the legal meeting Plaintiff was rear-ended by a vehicle. As such, she has been out of work at **HCL** since September 2, 2016.
**(3.55)** Plaintiff's FMLA was exhausted in October 2016, and her short-term disability was closed by Unum on December 29, 2016.
**(3.56)** On April 7$_{th}$, 2017, Plaintiff received a formal letter of termination by email from the aptly named Charles Ebenezer (**EBENEZER**) of **HCL**'s HR department. A few weeks later, another **HCL** employee emailed **BROGDEN** demanding repayment of insurance premiums that are allegedly owed by **BROGDEN**
**(3.57)** While the **EEOC** declined to take action it issued **BROGDEN** a right-to-sue-letter.
**(3.58)** Despite repeated warnings to Ms. Cotner that **BROGDEN** is a represented party, **BROGDEN** continues to receive letters and emails from **HCL INDIA** and **HCL** demanding $700 or threatening legal action.
    **(3.58.1)** On **MY** information and belief, no money is owed.
**(3.59) BROGDEN** owned certain property, including a noise cancelling headset for her condition and a mousepad her 10-year-old daughter made for her, that **HCL have spitefully refused to return, in addition to the monetary demands previously described.**

## CONCLUSION

Companies like HCL, Infosys, Tech Mahindra, ZL Technologies, and their ilk are bad news for America. Their abusive employment practices create veritable IT sweatshops that, behind the faux veneer of a functional workplace, derrived straight from their corporate parents whose very disregard for humanity allows outsourcing to help cut costs in the first place.

If this society values anything but corporate profit (and even then, *foreign* corporate profit), the H1b must be immediately reformed.

**COUNTS**

As I am performing all legal work free of charge, I have not googled the CACI jury instructions for each count so they can be recited pro forma and survive a motion to dismiss, but hereby declare under penalty of perjury that each element is satisfied.

This Complaint is hereby incorporated by reference as though fully set forth herein.

Count I: Fraud
If **HCL** acted as alleged, **HCL** committed FRAUD

Count II: Employment Discrimination
If **HCL** acted as alleged, Defendant committed EMPLOYMENT DISCRIMINATION

Count III: Violation of Title VII of the Civil Rights Act
If **HCL** acted as alleged, Defendant VIOLATED TITLE VII OF THE CIVIL RIGHTS ACT

Count IV: Violation of the Americans with Disabilities Act
If **HCL** acted as alleged, Defendant VIOLATED THE AMERICANS WITH DISABILITIES ACT

Count V: Intentional Infliction of Emotional Distress

If **HCL** acted as alleged, **HCL** VIOLATED THE AMERICANS WITH DISABILITIES ACT

HCL India, Ogletree, and Cotner are alleged to be coconspirators in a deliberate scheme to protect these abusive practices against Caucasian employees like **BROGDEN.**

Relief Requested

| Against **HCL** | Damages of $1,000,000,000; permanent injunction against their filing of any **H1b** applications under Immigration and Nationality Act §101(a)(15)(H)(1)(b) |
|---|---|
| Against **USCIS** | A Temporary Restraining Order enjoining USCIS from granting *any* **H1b APPLICATIONS**, <br><br> A PERMANENT INJUNCTION against granting of *any* **H1b APPLICATIONS** at a salary that is *less than* 10 times the poverty level for the H1b applicant employee and its dependents, accounting for the Cost of Living Adjustment (**COLA**) calculated for employees of the federal government |
| Against **OGLETREE** | A permanent injunction against its practice of law <br> Sanctions of $1,000,000 payable to this Court |
| Against **COTNER** | Sanctions of $450,000 payable to this Court |

*Brogden v. HCL, et. al.*

Respectfully Filed,

_____

VOX POPULI

CA BAR #284924

ON BEHALF OF PLAINTIFF DALLAS BROGDEN